IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

   *Plaintiff*,

   v.

   Crim. No. ELH-18-166

FREDDIE EMERSON CROCKETT,

   *Defendant*.

## MEMORANDUM OPINION

In this child pornography case, the Court must determine whether an error and an omission in an affidavit in support of a search warrant justify a *Franks* hearing. *See Franks v. Delaware*, 438 U.S. 54 (1978).

Defendant Freddie Emerson Crockett was indicted on March 27, 2018 (ECF 1) on one count of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2). The Indictment followed the seizure on November 22, 2017, of two electronic devices found in defendant's home, which contained visual depictions of prepubescent females engaged in sexually explicit conduct. The seizures were made pursuant to a search warrant issued on November 21, 2017, by Judge V. Michael Whelan of the Circuit Court for Cecil County, Maryland. *See* ECF 19-1.[1]

Defendant has filed a "Motion For A Franks Hearing" (ECF 19, the "Motion"), which is supported by several exhibits. He challenges the veracity of the Affidavit in support of the search warrant, submitted by Trooper First Class ("TFC") Frank Donald of the Maryland State

---

[1] The Indictment also contains a "Special Allegation," stating that Crockett had been previously convicted of two counts of conducting visual surveillance with prurient intent, in violation of Maryland Code, Criminal Law Article § 3-902(c). As a result, Crockett was ordered to register as a Tier I sex offender under Maryland law. *See* ECF 1 at 2.

Police ("MSP").  According to defendant, the Affidavit intentionally or recklessly contained a material false statement as well as a material omission.  The government opposes the Motion (ECF 22) and has also submitted exhibits.[2]  The defense replied.  ECF 23.

The Court held a hearing on August 16, 2018, at which argument was presented.  The evidence consisted of the parties' exhibits appended to their submissions.[3]

For the reasons that follow, I shall deny the Motion.

## I.    Standard For A *Franks* Hearing

Generally, an accused is not entitled to an evidentiary hearing to challenge a facially valid search warrant affidavit.  *United States v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011).  When reviewing the issuing judge's probable cause finding, consideration is ordinarily confined to the four corners of the application documents.  There is, however, a narrow exception to this rule, which the Supreme Court established in the seminal case of *Franks v. Delaware*, 438 U.S. 154 (1978).

*Franks* established that, under limited circumstances, an accused is entitled to an evidentiary hearing concerning the veracity of statements in an affidavit in support of a warrant.  To obtain an evidentiary hearing regarding the integrity of an affidavit, however, a defendant must first make "a substantial preliminary showing that a false statement [or omission] knowingly and intentionally, or with reckless disregard for the truth, was included [or omitted] by the affiant in the warrant affidavit."  *Franks*, 438 U.S. at 155-56.  This showing "must be

---

[2] In its opposition, the government frequently cites to facts or allegations in the exhibits, without providing specific citations.  *See*, *e.g.*, ECF 22 at 2-13.

[3] For convenience, I shall refer to the exhibits by way of the docket numbers assigned through the court's electronic filing system.

more than conclusory" and "must be accompanied by an offer of proof," in order to overcome the "presumption of [the warrant's] validity." *Franks*, 438 U.S. at 171.

The *Franks* Court established a two-prong test as to what a criminal defendant must show when making such a challenge. *Id.* at 155-56. The test applies to cases "in which an agent includes affirmatively false statements in a warrant affidavit, [and] also when an agent *omits* relevant facts from the affidavit." *United States v. Lull*, 824 F.3d 109, 114 (4th Cir. 2016) (emphasis in *Lull*); *see also United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990). The defendant has the burden to establish both prongs of the test by a preponderance of the evidence. *Franks*, 438 U.S. at 156.

Under the first prong—the "intentionality" prong—the defendant must make "a substantial preliminary showing that a false statement [was made] knowingly and intentionally, or with reckless disregard for the truth . . . by the affiant in the warrant affidavit." *Id.* Under the second prong—the "materiality" prong—the defendant must show that the false information is necessary to the probable cause determination and, without the false statement, the affidavit cannot support the finding of probable cause. *Id.* at 156, 171-72; *see also United States v. McKenzie-Gude,* 671 F.3d 452, 462 (4th Cir. 2011); *United States v. Clenney,* 631 F.3d 658, 663 (4th Cir. 2011). However, if the excision of the allegedly false statement would not change the "probable cause calculus," the accused is not entitled to a *Franks* hearing. *United States v. Cioni,* 649 F.3d 276, 286 (4th Cir. 2011); *see also United States v. Doyle*, 650 F.3d 460, 468 (4th Cir. 2011) (stating that "false information will only void a warrant if the information was necessary to the finding of probable cause"); *Allen*, 631 F.3d at 171; *United States v. Gary*, 528 F.3d 324, 328 (4th Cir. 2008). Put another way, the movant must demonstrate that, "with the

affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause . . . ." *Franks*, 438 U.S. at 156.

To be sure, "omissions can, in certain circumstances, give rise to a *Franks*, hearing . . . .";
*Cioni*, 649 F.3d at 286. But, "[m]erely identifying factual omissions is insufficient." *Clenney*,
631 F.3d at 664. Indeed, "[o]mitted information that is potentially relevant but not dispositive is
not enough to warrant a *Franks* hearing." *Colkley*, 899 F.2d at 301. Rather, "to be material
under *Franks*, an omission must do more than potentially affect the probable cause
determination: it must be 'necessary to the finding of probable cause.'" *Colkley*, 899 F.2d at 301
(quoting *Franks*, 438 U.S. at 156). So, "to obtain a *Franks* hearing based on omissions, the
defendant must show that the omissions were '*designed to mislead,* or . . . made in *reckless
disregard of whether they would mislead*' and that the omissions were material, meaning that
their 'inclusion in the affidavit would defeat probable cause.'" *Clenney*, 631 F.3d at 664
(quoting *Colkley*, 899 F.2d at 301) (emphasis in *Clenney*). Therefore, a showing that an officer
acted negligently, or that the omission was merely an innocent mistake, is insufficient to warrant
suppression. *Franks* 438 U.S. at 171; *Miller v. Prince George's Cty.*, 475 F.3d 621, 627-28 (4th
Cir. 2007); *see also United States v. Shorter*, 328 F.3d 167, 170 (4th Cir. 2003) ("[M]ere[]
negligen[ce] in recording the facts relevant to a probable-cause determination" is not enough).

The Fourth Circuit observed in *Lull*, 824 F.3d at 115: "Understandably, the defendant's
burden in showing intent is greater in the case of an omission because '[a]n affiant cannot be
expected to include in an affidavit every piece of information gathered in the course of an
investigation.'" (quoting *Colkley*, 899 F.2d at 300). And, "the significance – or insignificance –
of a particular omission to the determination of probable cause may inform [the court's]
conclusion regarding the agent's intent.[]" *Lull*, 824 F.3d at 117.

If the requisite showing is made, "the warrant must be voided," *Franks*, 438 U.S. at 156, and the fruits and evidence "gathered pursuant to it must be excluded." *Colkley*, 899 F.2d at 300. Moreover, if a warrant violates *Franks*, it is not subject to the good faith exception to the exclusionary rule under *United States v. Leon*, 468 U.S. 897, 923 (1984). *See Doyle*, 650 F.3d at 467.

As noted, a misstatement in an affidavit is of no consequence if the affidavit is redacted so as to excise the misstatement, and it nonetheless establishes probable cause. *See United States v. Richardson*, 607 F.3d 357, 369 (4th Cir. 2010). Similarly, if the affidavit establishes probable cause despite an alleged omission, the omission is of no moment. Therefore, I pause to review briefly the concept of probable cause.

The Supreme Court said in *Ornelas v. United States*, 517 U.S. 690, 696 (1996), that probable cause "exist[s] where the known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found." Moreover, an assessment of probable cause must be based on the totality of the relevant circumstances, and not on a formulaic legal test. *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983); *Allen*, 631 F.3d at 172.

In *Maryland v. Pringle*, 540 U.S. 366 (2003), the Supreme Court reiterated, *id.* at 370-71 (citations and quotations marks omitted):

> [T]he probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.
>
> The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. We have stated, however, that [t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and

that the belief of guilt must be particularized with respect to the person to be searched or seized[.]

As indicated, the concept of probable cause is not subject to precise definition. *Richardson*, 607 F.3d at 369. Rather, "[p]robable cause is a flexible standard that simply requires 'a reasonable ground for belief of guilt' and 'more than bare suspicion.'" *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2011) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). The "standard" of "'reasonable ground for belief of guilt' requires less of a showing than does the formal preponderance-of-the evidence standard." *Ortiz*, 669 F.3d at 444-45 (citing *Gates*, 462 U.S. at 235). Indeed, such "[f]inely-tuned standards . . . useful in formal trials, have no place in the magistrate's decision." *Gates*, 462 U.S. at 235.

Notably, a search warrant is construed "in a commonsense manner" in order to serve the "significant purpose of encouraging officers to obtain judicial approval prior to conducting a search." *United States v. Dargan*, 738 F.3d 643, 647 (4th Cir. 2013). An "overly stringent" construction of probable cause is not required. *Id.* at 648.

I turn next to review a handful of cases that are informative with regard to a *Franks* issue.

In *Colkley*, 899 F.2d 297, a bank robbery case, defendant Johnson complained that the District Court should have suppressed his post-arrest incriminating statements, because the affidavit in support of the arrest warrant did not recount that eyewitnesses failed to identify Johnson in a photo spread. In addition, he complained because the agent based the composite height description of the vault robber, allegedly Johnson, on the testimony of only one witness, disregarding other witnesses who described the vault robber as shorter than the person depicted in the affidavit. On this basis, the defendant requested and received a *Franks* hearing.

The Fourth Circuit did not agree with the district court that a *Franks* hearing was appropriate. In its view, the defendant did not make the requisite preliminary showing that the

affiant intended to mislead the magistrate, and inclusion of the omitted information would not have defeated probable cause in any event. *Id*. at 300.

As to a claim of omission, the Fourth Circuit was mindful of "the realities of the warrant application process." *Id*. It stated: "An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *Id*. Although a decision not to include information is intentional, a mere intentional omission is not within the scope of *Franks*, because the requisite intent would be satisfied in virtually every case. The *Colkley* Court stated: "*Franks* clearly requires defendants to allege more than 'intentional' omission in this weak sense." *Id*. at 301. The Court continued: "*Franks* protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate . . . To obtain a *Franks* hearing, the defendant must show that the omission is the product of a 'deliberate falsehood or of reckless disregard for the truth.'" *Id.* (quoting *Franks*, 438 U.S. at 171).

Thus, the *Colkley* Court recognized that "the affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to include a matter that might be construed as exculpatory." 899 F.2d at 301. In its view, the most that the record revealed was the agent's "failure to include the photo spread information . . . ." *Id*. However, the Court declined to infer intent or recklessness from the mere fact of such an omission. *Id.* As to that conduct, the Fourth Circuit observed that the agent's "acts fell far short of the level of flagrant police action *Franks* is designed to prevent, and a hearing under that decision was not required." *Id*.

In the Fourth Circuit's view, to the extent that the photospread information was exculpatory, it was not enough to defeat probable cause when weighed against the content of the

affidavit.  *Id*. at 302.  The Court recognized that "a requirement that all potentially exculpatory evidence be included in an affidavit would severely disrupt the warrant process.  The rule would place an extraordinary burden on law enforcement officers, who might have to follow up and include in a warrant affidavit every hunch and detail of an investigation in the futile attempt to prove the negative proposition that no potentially exculpatory evidence had been excluded."  *Id*. at 303.  The Court concluded: "In short, a rule requiring affiants to disclose all potentially exculpatory information has nothing to recommend it.  Unless a defendant makes a strong preliminary showing that the affiant excluded critical information from the affidavit with the intent to mislead the magistrate, the Fourth Amendment provides no basis for a subsequent attack on the affidavit's integrity."  *Id*.

The case of *United States v. Tate*, 524 F.3d 449 (4th Cir. 2008), reached a contrary result.  There, the defendant claimed that his trash had not been abandoned, and therefore the search of it by the police was unconstitutional under *California v. Greenwood*, 486 U.S. 35 (1988).  As a result, he challenged the warrant, which included the contents of the search.

To support Tate's request for a *Franks* hearing, he proffered, *inter alia*, a letter from the Division Chief of the Baltimore Department of Public Works' Bureau of Solid Waste as to when the defendant's trash collection occurred; two affidavits, one from a neighbor and another from a defense investigator concerning the trash pickup and where Tate's garbage was stored; photographs of the residence showing a locked gate and the area where the trash was kept; and a copy of another search warrant affidavit two months earlier in an unrelated case, in which the same officer stated that the trash bags were easily accessible in language quite similar to what was in the affidavit at issue.  The district judge denied the request for a *Franks* hearing.

The Fourth Circuit concluded that Tate had made the requisite preliminary showing that the law enforcement agent had knowingly and intentionally, or with reckless disregard for the truth, omitted a material statement in the affidavit in support of the warrant. *Id*. at 457. The Court focused on the agent's omission of facts about the location of trash that had been searched, the contents of which undergirded the affidavit.

The Fourth Circuit reasoned, 524 F.3d at 456: "If Tate's facts are correct, the affidavit omitted the important details . . . that the trash had not been abandoned, and that the trash bags were seized in violation of Tate's reasonable expectation of privacy." According to the Court, the facts, as proffered, tended to show that the agent "may have violated Tate's reasonable expectation of privacy because the trash was not out at the curb for collection on the date of Agent Manner's search but rather in a container near the rear steps of the home." *Id.*

Moreover, the Court determined "that if Tate's facts are true, the inclusion of the allegedly omitted information – that Agent Manners illegally searched Tate's trash – would have defeated probable cause. If the trash investigation was conducted illegally, the facts derived from it would have to be stricken from the affidavit." *Id.* at 457. And, said the *Tate* Court: "Without the facts drawn from the trash investigation, the remaining contents of the affidavit would not have supported a finding of probable cause." *Id.*

With these principles in mind, I turn to review the factual background in this case.

## II.     Factual Summary

### A.  Overview

The investigation that led to the issuance of the search warrant was based on three Cyber Tipline reports sent to the Maryland State Police in October 2017, by the National Center for

Missing and Exploited Children ("NCMEC"). The reports indicated that Yahoo! Inc. ("Yahoo"), an electronic service provider, had detected the transmission of child pornography.[4]

In particular, on October 17, 2017, a little more than a month prior to the issuance of the search warrant at issue, the MSP received Cyber Tipline Report 24709693 from NCMEC. ECF 19-2 ("First Report"). NCMEC indicated that on October 4, 2017, Yahoo reported that on October 20, 2016, 133 files of suspected child pornography were uploaded onto its networking service "Flickr," a free image and video hosting website. ECF 19-2 at 1, 6. Yahoo provided the following information about the account user, *id.* at 6:

Name: Freddie c

Phone: 1 4439078236

Email Address: lordshackisac@yahoo.com

Alternate Email: bcfdres1cue@yahoo.com

According to NCMEC, the images were uploaded from Internet Protocol ("IP") address 50.190.152.216. *Id.* at 6, 31. And, Yahoo indicated that the IP address was assigned to a Comcast internet subscriber located near Elkton, Maryland. *Id.* at 31.

NCMEC also provided additional information ascertained through its investigation. For example, a Google search for "lordshackisac@yahoo.com" revealed a post on August 25, 2010, on an internet forum titled "AgTalk," in which the user, "Fredneck," identified himself as Freddie Crockett; stated that he lived in Rising Sun, Maryland; his family had a dairy farm in Earleville, Maryland; and his email address was "Lordshackisac@yahoo.com." ECF 19-2 at 33. He signed off as "Fred Crockett jr (fredneck)." *Id.*

---

[4] The reporting requirement is mandatory. *See* 18 U.S.C. § 2258A.

Further, NCMEC disclosed a possible criminal record for a white male named Freddie Emerson Crockett, with a date of birth of August 2, 1978, and an address of 43 Peddlers Lane, Earleville, Maryland. He was listed on the Maryland Sex Offender Registry ("SOR") in connection with charges relating to visual surveillance with prurient intent. ECF 19-2 at 34. His registration date was "06/12/2017." *Id.*

NCMEC also searched the Maryland SOR, which revealed that on December 1, 2010, Freddie Emerson Crockett was convicted in Cecil County, Maryland on two counts of visual surveillance with prurient intent, in violation of § 3-902 of the Criminal Law Article of the Maryland Code. *Id.* at 36. Crockett was required to register as a Tier I sex offender. *Id.* The SOR further revealed that Crockett's date of birth is August 2, 1978. *Id.* And, according to the Cecil County Sheriff's Office, he was in compliance with his sex offender registration obligations. The SOR also indicated that Crockett was associated with a gray Jeep bearing Maryland license plate number 16289M8. *Id.*

Notably, the First Report indicated that on June 11, 2015, Crockett changed his primary residence to 43 Peddlers Lane, Earleville, Maryland. *Id.*

Also on October 17, 2017, NCMEC provided MSP with a Supplemental Cyber Tipline Report ("Supplemental Report"), as part of Report No. 24961893, *i.e.*, The First Report. ECF 19-2 at 45-49. The Supplemental Report indicated that on October 16, 2017, NCMEC had received additional information from Yahoo's E-Crime Investigations Team ("ECIT") regarding the investigation it conducted into the user identified in the First Report.

According to ECIT, the Yahoo account, lordshackisac, was linked to nine other Yahoo accounts, all of which were identified in the Supplemental Report. *Id.* at 45. In addition, all of the Yahoo accounts shared a common telephone number. From March 19, 2012 until May 23,

2017, the number was 443-907-8235. The number was changed to 443-907-8236 as of May 23, 2017. *Id.* Notably, at one place in the Supplemental Report, the new phone number was identified as "443-907-82356."[5] The Supplemental Report also stated that the user is a registered sex offender who "appears to reside" in Earleville, Maryland. ECF 19-2 at 45.

The Supplemental Report advised that the Flickr account lordshackisac is associated with the Yahoo account lordshackisac@yahoo.com, and the name on the Yahoo account is "Mr. Freddie c." ECF 19-2 at 45. That Yahoo account was created on March 3, 2004, from AOL IP address 152.163.252.193. *Id.* As to the "lordshackisac" Yahoo account, ECIT indicated that the user's gender is male; the user's date of birth is August 2, 1978; and the user-provided location is "Earleville, MD, United States, 21919." *Id.* at 46. ECIT also reported that the email account of bcfdres1cue@yahoo.com is an alternate email address for both the "fcrockett33" Yahoo account and the lordshackisac Yahoo account. *Id.* at 45.

The last successful login to the "lordshackisac" Yahoo account occurred on May 23, 2017, from Comcast IP address 2601:145:c400:5bac::707 (sometimes referred to as the "2601 IP address"), located in or around Elkton, Maryland. *Id.* at 46. Of relevance here, on October 3, 2017, Yahoo deactivated the "lordshackisac" Yahoo account for possession of child sexual abuse imagery ("CSAI"). ECF 19-2 at 46; ECF 22-1 at 3.

As noted, the lordshackisac Yahoo account was associated with several other Yahoo accounts. They were identified as follows, *id.*:

> • fcrockett33@yahoo.com;
>
> • bcfdres1cue@yahoo.com;
>
> • johndeere4020@yahoo.com;

---

[5] Clearly, that number is a mistake, because it has an extra digit. The new last digit followed the last digit of the prior phone number.

- jr.emersonc@yahoo.com;

- redemerson99@yahoo.com;

- freddieemerson99@yahoo.com;

- whitenutsjunior@yahoo.com;

- fred.crockett@yahoo.com;

- reginaldscott131@yahoo.com

The Supplemental Report also reviewed the various related Yahoo accounts. ECF 19-2 at 45-49. The accounts had user names such as "Mr. Freddie C," "Fred Crockett," and "Freddie Emerson." *Id.* at 45-48. For example, with regard to the email account of bcfdres1cue@yahoo.com, ECIT indicated that the name on the account is "Fred C." *Id.* at 47. It had alternate email addresses of Copedipper4020@gmail.com and lordshackisac@yahoo.com. *Id.* And, the date of birth provided for the account was August 2, 1978. *Id.* Moreover, ECIT reported that the "bcfdres1cue" Yahoo account was created on February 17, 2011, from Cogent Communications IP address 38.118.53.90; the last successful login to the account took place in or around Elkton, Maryland on November 15, 2016, using Comcast IP address 50.190.152.216; the Yahoo account remained active; and the account phone number, 443-907-8235, was verified on October 3, 2017. *Id.*

Significantly, although the "bcfdres1cue" Yahoo account was created in February 2011, NCMEC reported that the user's affiliated Flickr account, bcfdres1cue, was not created until October 3, 2017. *Id.* at 47. And, the user's Flickr screen name for the account is "Fred C." *Id.*

On October 30, 2017, MSP received a second CyberTipline Report, No. 25100919 from NCMEC. ECF 19-3 (the "Second Report"). Specifically, NCMEC indicated that on October 24, 2017, Yahoo identified two image files containing suspected child pornography in an account

using its Flickr service. *Id.* at 3. NCMEC indicated that the reported user appears to be a registered sex offender, *id.* at 6, and it provided the following identifying information about the account user, *id.* at 3:

Name: Fred C

Phone: 443-907-8235

Email Address: bcfdres1cue@yahoo.com

Alternate Email: Copedipper4020@gmail.com

Of relevance here, the Second Report did not include information about the date on which the two image files had been uploaded to the user's account. Nor did it specify the IP address from which they had been uploaded. But, the Second Report stated, *id.* at 6: "The reported user appears to be a registered sex offender."

On November 2, 2017, MSP Sergeant Kemery Hunt authored a memorandum summarizing steps taken by MSP in response to the NCMED reports. ECF 19-5; ECF 22-1 at 6 (same). Because the IP addresses associated with the 2016 activity were "old," Hunt contacted Yahoo to obtain updated IP addresses. ECF 19-5 at 1. He was advised that the most updated IP address was the 2601 IP address. ECF 19-5.

MSP Trooper First Class Donald also wrote a detailed internal report on November 2, 2017 (ECF 22-1 at 2-5), to which he attached the three NCMEC reports. *Id.* at 2. Among other things, he recounted the information obtained from NCMEC. *Id.* Donald noted that 133 files containing child pornography were uploaded on October 20, 2016, from Comcase IP address 50.190.152.216. *Id.* at 2-3. Further, he stated that the last successful login to lordshakisac@ yahoo.com occurred on May 23, 2017, from the 2601 IP address. *Id.* at 3. He also noted that Yahoo deactivated the account on October 3, 2017, for possession of CSAI. ECF 22-1 at 3.

As to the Second Report, TFC Donald stated that it was received by the MSP on October 17, 2017 (*id.* at 4) and it indicated that "2 mages [sic] . . . were uploaded to 'Yahoo!, Inc.' from IP address '50.190.152.216.'" *Id.* at 5. In fact, the date was incorrect, and that IP address was not included in the Second Report.[6] TFC Donald then described the two images, setting forth the pornographic depiction of two female minors. *Id.*

Moreover, a subpoena was issued to Comcast for the relevant subscriber information. Hunt received Comcast's response on November 8, 2017. ECF 19-5; ECF 22-1 at 6; ECF 22-2. It indicated that the 2601 IP address was assigned on May 23, 2017, to the following account, ECF 22-2:

> Subscriber Name: Tina Crockett
>
> Service Address: 43 Peddlers Lane, Earleville, Maryland 21919 2105
>
> Telephone #: 410-920-1126, 410-000-0000
>
> Type of Service: High Speed Internet Service
>
> Account Number: []
>
> Account Status: Active
>
> IP Assignment: Dynamically Assigned
>
> E-mail User Ids: lordshackisac
>
> (the above user Id(s) end in @comcast.net)

On November 16, 2017, at approximately 5:30 a.m., TFC Donald conducted visual surveillance outside the single-family residence at 43 Peddlers Lane in Earleville. He observed three vehicles parked in the driveway, including a gray Jeep SUV bearing Maryland registration 5AR2341. The other vehicle was a gold Chevrolet truck with Maryland registration 7DA1444.

---

[6] If TFC Donald used his own report to prepare the Affidavit for the search warrant application, this would explain the repetition of these errors in the Affidavit.

TFC Donald queried the Maryland Motor Vehicle Administration ("MVA") database and discovered that the Jeep was previously assigned Maryland registration 16289M8, and that both vehicles were registered to Freddie and Tina Crockett of 43 Peddlers Lane in Earleville.  *See* ECF 19-1 at 15.  Donald also obtained from the Cecil County Sheriff's Office the official police report regarding the conduct underlying Crockett's 2010 convictions on two counts of visual surveillance with prurient intent.  *Id.* at 14.

### B.  The Search Warrant

On November 21, 2017, TFC Donald sought a search warrant for Crockett's home.  *See* ECF 19-1.  His Affidavit in support of the search warrant is at issue here.  It consists of 18 single-spaced pages, with a handful of mistakes.

In the Affidavit, TFC Donald described his professional experience and training in regard to cyber investigations and the sexual exploitation of children, including his role in the "Internet Crimes Against Children" ('ICAC') Task Force."  ECF 19-1 at 2-3.  The Affiant claimed that his primary investigative focus concerns Internet-related crimes, including the exploitation of children.  *Id.* at 2.  On page 2 of the Affidavit, TFC Donald asserted, inconsistently, that he has been employed by the Maryland State Police for "approximately five (6) years . . . ."

TFC Donald also recounted detailed information as to computers and internet terms.  And, he related descriptions and characteristics of persons involved in the receipt and collection of child pornography and their use of the Internet and computers.  *Id.* at 3-7; 9-10.

TFC Donald defined an "Internet Protocol Number" or "IP" address as "a unique number" and observed: "Every machine that is on the Internet has a unique IP number . . . ."  ECF 19-1 at 4.  Further, TFC Donald explained that Maxmind.com is "a website that assists in identifying Internet Protocol addresses and geo-locating an area where the IP address returns."

16

*Id.* Donald also averred, *id.*: "Maxmind is a provider of IP intelligence and online fraud detection and will identify the Internet Service Provider (ISP) when an IP address is searched through the website." *Id.* Further, Donald explained the way in which IP addresses are assigned, stating: "IP addresses can be assigned to a subscriber for an extended amount of time to include but not limited to; [sic] one 1 year." *Id.* at 6.

In addition, TFC Donald explained "the use of wireless Internet connection (Wi-Fi)" and the development of technology, facilitating use of the Internet through "smartphones," which "can be considered as a Personal Pocket Computer . . . ." *Id.* at 5. He also identified mobile phones and laptop computers as internet accessible. *Id.* Of pertinence here, TFC Donald asserted: "[T]he computer has become the preferred method of child pornography distribution." *Id.* And, he asserted, *id.* at 7: "Your AFFIANT also knows from training and experience that individuals who are involved with sexual exploitation of children and child pornography, rarely, if ever, dispose of their sexually explicit materials. It is also known that these individuals would not quickly dispose of pictures and videos but retain them for their own future sexual gratification." *Id.* In addition, TFC Donald stated, *id.* at 6: "These individuals often retain these images . . . on computer data storage services for long periods of time and tend to re-access these files with varying regularity . . . . Persons who collect child pornography tend to maintain their collection so that they have immediate access to it."

Also of relevance, TFC Donald asserted, *id.* at 9: "It is possible to recover deleted digital files (*i.e.* image/video files) months or years after they are deleted from the computer system. This is because deleted data remains on a device and/or storage media device until it is over-written with new data." In addition, he averred that data "stored in the cloud storage areas" may be obtained by forensic analysis. *Id.*

TFC Donald also described the reports received by the MSP from NCMEC. As indicated, a total of three reports were received on two separate dates in October 2017. However, Donald erroneously indicated that the reports were all received on October 17, 2017.[7] *See* ECF 19-1 at 11, 15.

As to the First Report, TFC Donald recounted that on October 17, 2017, MSP received from NCMEC CyberTip Reports 24709693 and 24961893. ECF 19-1 at 11. According to the reports, a representative of Yahoo identified someone as "possibly being in possession of, manufacturing, distributing and/or soliciting illegal content on their networking service, 'Flickr.'" *Id.* Donald explained that Flickr is a free image and video hosting website owned by Yahoo. *Id.* Further, TFC Donald averred, *id.*: "The Cybertip included 133 files containing images that were uploaded to 'Yahoo!, Inc.' on 10/20/2016 . . . from IP address '50.190.152.216.'" *Id.* TFC Donald averred that the "vast majority of the files contained images" depicting girls believed to be between the ages of 10-12 engaged in sexually explicit conduct. *Id.* He provided a detailed description of three of those images. *Id.* at 11-12.

TFC Donald also recounted that Yahoo "captured" the following user name information, *id.* at 12:

> **Name:** Freddie C
> **Email Address:** lordshackisac@yahoo.com
> **Phone:** 1 4439078236
> **Alternate Email:** bcfdres1cue@yahoo.com

In addition, TFC Donald averred that a "MAXMIND.com search revealed that IP address '50.190.152.216' belongs to the Internet Service Provider, Comcast Cable." *Id.* And, the IP address geo-located to Elkton, Maryland, in Cecil County. *Id.* TFC Donald also said: "Due to

---

[7] As to TFC Donald's mistake regarding the date of receipt of the Second Report, the defendant acknowledges that this "might have been an honest mistake . . . ." ECF 19 at 12, n.7.

the staleness of this IP address, NCMEC provided updated information in a supplemental Cybertip report." ECF 19-1 at 12. In the Supplement, according to Donald, NCMEC "provided the last successful login to the Yahoo account lordshackisac@yahoo.com, which was on 5/23/2017 at 01:57:34 (GMT) from Comcast IP address 2601:145:c400:5bac::707 . . . located in or around Elkton, MD." ECF 19-1 at 12. And, he noted that Yahoo deactivated that account on October 3, 2017, for possession of child pornography. *Id.*

Additionally, TFC Donald averred that Yahoo's "E-Crime Investigations Team (ECIT) has revealed the user appears to reside in or around Earleville, MD and is currently a Registered Sex Offender . . . ." *Id.* Moreover, Donald asserted: "ECIT has linked the reported Yahoo account lordshackisac@yahoo.com to nine (9) additional Yahoo accounts, which appear to belong to the user." *Id.* And, Donald identified all nine email addresses to which the lordshackisac email account was linked. *Id.* at 12-13. Several of those email addresses, as set forth in the Affidavit, contain versions of defendant's name. *Id.* at 13.

Further, TFC Donald reported that the Yahoo accounts are linked to the same phone number, which was associated with the lordshackisac email address from March 19, 2012, until May 23, 2017, when the phone number was changed. *Id.* at 12. The original phone number was "+1-4439078235," and it was changed to to "+1-44390782356." *Id.* The telephone number +1-44390782356 obviously is an error because it includes an extra digit; it contains, in succession, the last digit of the original telephone number and the last digit of the new telephone number. But, as observed earlier, the First Report also misstated the new phone number. *See* ECF 19-2 at 45. In any event, the First Report also correctly identified the new telephone number as 443-907-8356. *See*, *e.g.*, *id.* And, the Affidavit contained the correct version of the new telephone number. *See*, *e.g.*, ECF 19-1 at 12.

The Affiant also recounted that a Google search of the lordshackisac email address revealed a post by a user with the name "Freddie Crockett" on August 5, 2010, which appeared on a website forum called "Ag Talk." ECF 19-1 at 13. TFC Donald included the content of the entire post, in which the user indicated his family had a dairy farm in Earleville, Maryland. *Id.* And, he noted that the author signed the post "Fred Crockett jr (fredneck)." *Id.* at 14.

Further, Donald stated that a Google search of "Freddie Crockett" indicated that he is a Tier I registrant on the Maryland Sex Offender Registry. *Id.* The registration was a consequence of the defendant's conviction in Cecil County for the offense of Visual Surveillance With Prurient Intent, in violation of "Cl § 3-902." *Id.* The Affiant asserted that he obtained the official police report, which indicated that the victim in that case was a 13-year-old female. *Id.*

In addition, the Affidavit contained information obtained from the Maryland Sex Offender Registry, including the full name of the registrant: Freddie Emerson Crockett; his address at 43 Peddlers Lane in Earleville; his race, age, height, and weight; his date of birth of August 2, 1978; various aliases; and a vehicle description of a gray Jeep with Maryland license plate number 16289M8. *Id.* And, according to the affiant, a "MVA query of Crockett confirmed his . . . current address." *Id.*

Further, the Affidavit recounted that on October 23, 2017, Sergeant Hunt sent a subpoena (via "the Howard County State's Attorneys Office") to Comcast for information as to the 2601 IP address, for which the last successful login to the lordshackisac Yahoo account took place on May 23, 2017. *Id.* at 14. TFC Donald averred, *id.*: "A Maxmind query revealed that this IP address belonged to Comcast" and it was "geo-located to Elkton, Maryland." Moreover, Donald averred that on November 8, 2017, Comcast provided the subscriber information for that IP address, as follows: Tina Crockett at 43 Peddlers Lane in Earleville, Maryland. *Id.*

The Affiant then described the Second Report, in about a half page. ECF 19-1 at 15. TFC Donald incorrectly averred that the MSP received the Second Report on October 17, 2017. *Id.*[8] According to TFC Donald, the Second Report disclosed "that someone was identified as possibly being in possession of, manufacturing, distributing and/or soliciting illegal content on their network service." *Id.* Of relevance here, TFC Donald asserted that the CyberTip included two images that were uploaded to Yahoo "from IP address '50.190.152.216.'" *Id.* However, that IP address was not, in fact, mentioned in the Second Report. *See* ECF 19-3. In addition, Donald described the two images, noting that they depicted females believed to be between the ages of 11 and 12, engaged in sexually explicit conduct. *Id.*

TFC Donald then recounted that on November 16, 2017, he conducted visual surveillance of 43 Peddlers Lane in Earleville and observed three vehicles parked in the driveway. *Id.* One was described as a gray 2008 Jeep SUV, bearing Maryland registration 5AR2341, but previously bearing registration 16289M8. *Id.*[9]; *see also* ECF 19-2 at 36. Two of the vehicles, according to the MVA, were registered to Freddie and Tina Crockett at that address. *Id.*

TFC Donald did not include in his Affidavit certain informative details that were contained in the Second Report. For example, he omitted that the Second Report pertained to the email address of bcfdres1cue@yahoo.com; it identified the user's name as "Fred C"; the user's phone number of 443-907-8235; and the user's alternate email address of Copedipper4020@gmail.com. *See* ECF 19-3 at 3. As noted, the email address of bcfdres1cue@yahoo.com was included in the First Report, and it was linked to the lordshackisac

---

[8] NCMEC actually received the report on October 24, 2017, and forwarded it to MSP on October 30, 2017.

[9] The Affidavit appears to refer interchangeably to license plates and registration. *See*, *e.g.*, ECF 19-1 at 14, 15.

Yahoo account. Moreover, the phone number of 443-907-8235 was included in both the First Report and the Second Report as the user's phone number. *See*, *e.g.*, ECF 19-2 at 46; ECF 19-3 at 3.

### III. Defendant's Contentions

Crockett's Motion is predicated on one false statement in the Affidavit and one omission. As the defendant observes, contrary to the content of the Affidavit, the Second Report never stated that the two images were uploaded from IP address 50.190.152.216. Yet, TFC Donald made that representation in the Affidavit. According to the defense, TFC Donald "intentionally included the IP address in order to factually connect the Second Cybertip to the First Cybertip." ECF 19 at 10. In defendant's view, the error was of "paramount" importance because it is the only identifying information as to the two child pornography images, and it is the only fact connecting the two Cybertips. ECF 23 at 2-3. In the absence of the IP address, argues Crockett, the Second Report "does nothing more than tell Judge Whelan that 2 CP [child pornography] images were uploaded to Yahoo! at an unidentified location by an unidentified user, and on an unidentified date." *Id.*

In support of the claim of intentionality, Crockett maintains that the Affiant had ample time to draft and review the Affidavit for accuracy, given that the Second Report was received several weeks before the Affidavit was submitted to Judge Whelan on November 21, 2017. ECF 23 at 4. He also points out that Donald is a "professed expert in computer crimes, "by which he recognized the importance of the common IP address to "bolster his claim that the same person uploaded the images at the same location." *Id.* at 3. In defendant's view, these factors lead one to "safely conclude" that the use of the IP address for the Second Report was "an intentional misrepresentation." ECF 19 at 13. Therefore, Crockett insists that the inclusion of the erroneous

information "was no mistake or accident." *Id.* at 12. Rather, it "appears" to have been "fabricated evidence to bolster [Donald's] claim that CP might be found in Mr. Crockett's home." *Id.* at 13.

Crockett elaborates: "By falsely attributing the same IP address that was in the first Cybertip to the second Cybertip, the officer intentionally or recklessly misled Judge Whelan into believing that the two distinct uploads of CP occurred at the same physical location, suggesting the same person uploaded them, either at the same time or a year apart, thereby misleading the Court into concluding that a collector of CP likely lived at 43 Peddlers Lane and that evidence of a crime would be found in the home." ECF 19 at 3.

According to defendant, "[i]f the false statement is excised from the affidavit, there was no probable cause to search the home." *Id.* He explains, *id.* at 3-4:

> Without any factual connection between the two distinct Cybertips, the affidavit provides merely that on October 20, 2016 – 13 months before the warrant was presented to Judge Whelan – an unidentified person, on an unidentified electronic device, at an unidentified location in or near Elkton, Maryland, uploaded 133 CP images to the website flickr using a Yahoo! email account associated with Freddie Crockett, whose address 13 months after the upload was 43 Peddlers Lane, Earleville, Maryland. The bare remains of the excised paragraph describing the second Cybertip – that two images of CP were uploaded to Yahoo! – contain no additional evidence connecting the CP upload to Mr. Crockett or to 43 Peddlers Lane. Thus, the evidence of a crime in the excised affidavit does not provide a sufficient nexus between the alleged criminal activity and the home, and to the extent there was a sufficient nexus, the evidence in the excised affidavit was too stale to provide probable cause to search the home.

In addition, Crockett contends that, even if there is a nexus between the evidence and defendant's home based on the First Report, that evidence was too stale to support a finding of probable cause. *Id.* at 13. In this regard, defendant argues that the IP address 50.190.152.216 was not associated with defendant's residence, nor was there evidence that defendant lived on Peddlers Lane in October 2016. ECF 19 at 16.

As to the omission, the defense observes that the Affidavit failed to disclose that the Second Report did not contain information as to the date of the upload of the two CP images. ECF 23 at 2. In this way, argues defendant, TFC Donald "hid an important fact from Judge Whelan." ECF 19 at 11; *see also id.* at 3. According to the defense, this was a material omission, "critically important to the probable cause determination," because it led the judge to conclude, erroneously, that the two images were uploaded more recently than the 133 images, which then "freshened" the "stale CP upload reported in the first Cybertip." ECF 19 at 3; ECF 23 at 11. Alternatively, Crockett contends that the omission was critical because it made it seem that the two uploads occurred "close in time," thereby "suggesting that the suspect was a collector of CP" and that evidence of a crime would be found at the home. ECF 19 at 3.

## IV.    Discussion

It is undisputed that the Affidavit inaccurately indicated that, according to the Second Report, the two images uploaded to Yahoo on an unspecified date came from IP address 50.190.152.216, which matched the IP address associated with the upload of 133 images in October 2016. In fact, as the parties agree, the Second Report did not mention any IP address. *See* ECF 19-3 (Second Report). Moreover, Crockett complains that the affiant omitted from the Affidavit that the Second Report never provided a date for the upload of the two images.

For the reader's convenience, and for comparison, I shall set forth below key portions of the contested Affidavit discussing the First Report and the Second Report, ECF 19-1 at 11, 15:

> On 10/17/2017, the Maryland State Police Computer Crimes Unit received a referral from the National Center for Missing and Exploited Children (NCMEC) regarding the possession and distribution of child pornography (CyberTip #24709693 and 24961893). According to the CyberTip, it was reported by a representative of the electronic service provider "Yahoo!, Inc.", that someone was identified as possibly being in possession of, manufacturing, distributing and/or soliciting illegal content on their networking service, "Flickr." Flickr is a free image- and video-hosting website and web services suite owned by, "Yahoo!,

Inc." According to the website, members of Flickr are given 1 terabyte of photo and video storage for free. The CyberTip included 133 files containing images that were uploaded to "Yahoo!, Inc." on 10/20/2016 at 04:03:44 UTC from IP address "50.190.152.216".

\*　　　\*　　　\*

On 10/17/2017, the Maryland State Police Computer Crimes Unit received a referral from the National Center for Missing and Exploited Children (NCMEC) regarding the possession and distribution of child pornography (CyberTip #25100919). According to the CyberTip, it was reported by a representative of the electronic service provider "Yahoo!, Inc.", that someone was identified as possibly being in possession of, manufacturing, distributing and/or soliciting illegal content on their networking service. The CyberTip included 2 images that were uploaded to "Yahoo!, Inc." from IP address "50.190.152.216". . . .

## A. The Omission

In regard to the omission, the Second Report is completely silent as to a date of the uploading of the two CP files. Crockett challenges TFC Donald's failure to inform the judge that the Second Report did not provide information concerning the date on which the two images were uploaded. In effect, the defense suggests that the Affiant had a duty to identify in the Affidavit information that was not included in the Second Report. He also claims that the omission is fatal in regard to establishing probable cause.

It would be patently clear to anyone reviewing the Affidavit that there is no mention of any date in connection with the upload of the two images. And, that is entirely consistent with the content of the Second Report, and not a distortion of it. As the government points out, if Judge Whelan concluded that there was no reported upload date, he was correct; he was not misled. ECF 22 at 22. Conversely, if he believed there was an upload date, he "invented" these facts. *Id.* But, there is nothing in the Affidavit that would necessarily have led the judge to conclude that the first and second uploads must have been contemporaneous or took place at the same location.

The defendant's attempt to cast a sinister light on the omission is not persuasive. The lack of a date for the upload is not exculpatory. Even if it were, there is no rule requiring a law enforcement officer to include all potentially exculpatory evidence, for this "would severely disrupt the warrant process" and "place an extraordinary burden on law enforcement officers . . . ." *Colkley*, 899 F.2d at 303. Nor does the Fourth Amendment require a search warrant affiant to include every known fact. *See Clenney*, 631 F.3d at 665 ("The process of preparing a warrant affidavit requires affiants to exercise discretion by selecting certain facts for inclusion and others for omission. 'An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation.'") (quoting *Colkley*, 899 F.2d at 300 (internal citation omitted)). Further, the Fourth Amendment does not demand that an affiant include facts that, while not contradicting information in the affidavit, might weigh against a finding of probable cause. *See Evans v. Chalmers*, 703 F.3d 636, 651 (4th Cir. 2012) ("Affiants are not required to include every piece of exculpatory information in affidavits." (citing, *inter alia*, *Colkley*, 899 F.2d at 299–301)).

Moreover, as the government observes, if Judge Whelan based his determination of probable cause "on the belief that the same individual had uploaded child pornography both on October 20, 2016, and more recently, <u>he would have been right</u>." ECF 22 at 23. In this regard, the First Report indicated that the upload of the 133 files occurred on October 20, 2016. It also stated that the Flickr account "bcfdres1cue" was not created until October 3, 2017. ECF 19-2 at 47. And, the Second Report concerned that same account, with the user name Fred C. Given the creation date, it follows that any activity with that account necessarily postdated the uploading of the 133 images referenced in the First Report, which occurred in October 2016.

As to intent to mislead, it is significant that TFC Donald had useful information in the Second Report that he completely omitted from the Affidavit. This undermines the contention that the omission in issue was deliberate, and made with the intent to mislead. For example, Donald omitted that the upload was linked to the email account of bcfdres1cue@yahoo.com, with the user name of "Fred C", or the common phone number, associated with the first upload. ECF 19-3 at 3. The reasonable inference is that TFC Donald did not regard the Second Report as particularly important to the probable cause determination. *Compare* ECF 19-1 at 15, *with* ECF 19-3.

## B. The Misstatement

The centerpiece of defendant's motion concerns TFC Donald's erroneous inclusion of an IP address in connection with the Second Report. No IP address was mentioned in the Second Report. And, according to defendant, the one misused by Donald was of particular significance, because it was the same IP address associated with the first upload of child pornography. With regard to the erroneous reference to the IP address, defendant fares no better.

As indicated, because of TFC Donald's experience in computer sex crimes, his knowledge of IP addresses, and his investigation of the case, the defense insists that "one can safely conclude that his false attribution of the stale IP address to the Second CyberTip was not an accident but an intentional misrepresentation." ECF 19 at 13. In defendant's view, Donald "fabricated evidence to bolster his claim that CP might be found in Mr. Crockett's home." *Id.* And, at the very least, if the false statement was not intentional, the defendant maintains that the error was "made with reckless disregard for the truth." *Id.*

According to the defendant, without the reference to the false IP address, "there is an insufficient nexus between the evidence of a crime and the home that was searched." *Id.* at 15.

He observes that the First Report stated that the upload of 133 CP files occurred on October 20, 2016, some 13 months before the warrant was signed, using the IP address that was erroneously linked to the second upload. But, defendant posits that there is no indication that defendant even lived on Peddlers Lane on October 20, 2016. ECF 19 at 16. Nor was there evidence that defendant possessed any electronic devices, either on October 20, 2016, or November 21, 2017. *Id.*

The 133 files of child pornography were uploaded to the website Flickr, an account associated with the email address lordshackisac@yahoo.com, registered to Freddie Crockett, who was on the Maryland Sex Offender Registry because of a prior Maryland conviction for visual surveillance of a minor with prurient intent. ECF 15 at 23. The MSP could determine that the upload occurred in the vicinity of Elkton, Maryland. The Sex Offender Registry provided a precise address for defendant in Earleville, Maryland. Yahoo's E-Crime Investigations Team revealed that the Yahoo lordshackisac account was linked to nine additional Yahoo accounts.

In the Supplemental Report, NCMEC advised that the last successful login to lordshackisac@yahoo.com occurred on May 23, 2017, from the 2601 IP address. ECF 19-2 at 46. However, Crockett points out that there was no reported upload of child pornography on May 23, 2017. ECF 19 at 17. And, according to the defense, even though CP images were associated with defendant's email address, they could have been uploaded by anyone, anywhere, if he or she had access to the account. *Id.* at 16.

The government suggests that the inclusion of the IP address 50.190.152.216, attributed to the Second Report, was not deliberate or made with the intent to mislead; it was merely a "cut and paste" error. In my view, Crockett has overstated the materiality of the error. And, he has not demonstrated that the error was made intentionally or recklessly.

As noted earlier, Donald wrote an internal report on November 2, 2017. ECF 22-1 at 2-5. In that report, which is detailed, he summarized the Second Report. There, he erroneously stated that the two CP images were uploaded from IP address 50.190.152.216. *Id.* at 5. Donald would not have had any reason or motive to deliberately prepare an internal document with the wrong IP address or any IP address. Clearly, he made an honest mistake in his own report, and he seems to have repeated the error when the Affidavit was prepared, most likely because he used his own summary to prepare the Affidavit.

The defendant's claim as to deliberate intent is also undermined by the important information in the Second Report that TFC Donald chose to omit, which arguably would have strengthened the probable cause determination. In particular, the Second Report indicated that the email address of bcfdres1cue@yahoo.com, with a user named "Fred C," and the phone number 443-907-8235, was associated with the upload of the two images of child pornography. ECF 19-3 at 3. TFC Donald could have pointed out that the phone number 443-907-8235, according to the First Report, was associated with the email lordshackisac@yahoo.com until May 23, 2017. ECF 19-2 at 45. Moreover, the email account bcfdres1cue@yahoo.com was linked to the lordshackisac@yahoo.com email as well as related Yahoo accounts. *See id.* The person with the same name and phone number as the user of the lordshackisac email account was using lordshackisac's alternate email address of bcfdres1cue, for which the related Flickr account was not created until October 3, 2017. *Id.* at 47.

Donald had indicated that "the last successful login to the Yahoo account lordshackisac . . . was on 5/23/2017 . . . from Comcast IP address 2601:145c:400:5bac::707." Because the Affidavit mistakenly said that the two images referenced in the Second Report were uploaded from the prior IP address, 50.190.152.216, the Affidavit suggested that the upload of

29

the two images occurred *before* May 23, 2017.  That conclusion would not "freshen" any staleness.  Rather, it reflects that Donald was not attempting to mislead the judge.

The presence of a handful of other mistakes in the Affidavit also suggests that the error in issue was not deliberate.  For example, Donald stated that he had "five (6) years of law enforcement experience."  ECF 19-1 at 2.  And, as to the Second Report, the Affiant stated that the MSP received it on October 17, 2017, when, in fact, it was not received by MSP until October 30, 2017.  *See* ECF 19-3 at 1, 8.  The defense concedes that this was likely "an honest mistake."  ECF 19 at 12, n.7.

I agree with the government that there is no justification for the defense to characterize the error in the date of receipt as "an honest mistake," while insisting that the error as to the IP address was deliberate.  It is reasonable to infer that Donald would have expected scrutiny of the CyberTips, given their importance to the case.  As the government puts it, defendant's conclusion is "illogical" when the documents "are readily and incontrovertibly ascertainable . . . ."  ECF 22 at 19 n.8.

## C.  Redaction and Staleness

If the IP address for the second upload were excised from the Affidavit, defendant maintains that the information as to the 133 images uploaded in October 2016 would be insufficient to establish probable cause.  In my view, information as to the Second Report is superfluous to the probable cause determination.

Even without any reference to the Second Report, the Affidavit established the following:

- On October 20, 2016, a Yahoo user named "Freddie C," whose multiple Yahoo email accounts included "lordshackisac", "fcrockett33", "freddieemerson99", "fred.crockett", and "bcfdres1cue@yahoo.com," uploaded 133 child pornography images via his Flickr account from IP address 50.190.152.216, in or around Elkton, Maryland.

- Freddie Emerson Crockett is a convicted sex offender in Maryland, in regard to a case prosecuted in Cecil County, Maryland that involved a thirteen-year-old female victim.

- Crockett is a Tier 1 registrant on the Maryland Sex Offender Registry, residing at 43 Peddlers Lane in Earleville, Maryland (Cecil County).

- In a post on a website "Ag Talk" on August 5, 2010, an individual named Freddie Crockett used the lordshackisac email account and stated that his family had a large dairy farm in Earleville, Maryland.

- Individuals with a sexual interest in children retain child pornography materials for sexual gratification, in the safety of their homes, and rarely, if ever, dispose of such materials.

- Individuals with a sexual interest in children often access those materials on electronic devices that they use to store and access child pornography.

- Deleted digital files may be recovered long after they are deleted from a computer system. A forensic examiner may also be able to recover materials from cloud storage and social media.

- The last log in to Yahoo account lordshackisac@yahoo.com occurred on May 23, 2017, from an IP address that belonged to a Comcast internet subscriber named Tina Crockett—Freddie Crockett's wife—at 43 Peddlers Lane, Earleville, Maryland.

- The lordshackisac Yahoo account was deactivated by Yahoo on October 3, 2017, for possessing and/or distributing child pornography.

- Freddie Emerson Crockett was presently residing at 43 Peddlers Lane. Vehicles belonging to him and his wife were located at that address on November 16, 2017.

TFC Donald was not required to establish that the defendant was the one who uploaded the child pornography or that he did so using a particular electronic device. Rather, TFC Donald's burden was to identify information demonstrating a "fair probability" that child pornography or evidence related to the possession and/or distribution of child pornography would be found on electronic devices at 43 Peddlers Lane. ECF 22 at 30. Probable cause "is

just that – probable – and does not require proof beyond a reasonable doubt." *United States v. Morales-Aldahondo*, 524 F.3d 115, 119 (1st Cir. 2008), *cert. denied*, 555 U.S. 1005 (2008).

Judge Whelan readily could have found probable cause to believe either that (1) the defendant himself was using electronic devices to possess or transmit child pornography at his home in October 2016; or (2) someone with a sexual interest in children was using a registered sex offender's Yahoo account to possess and transmit images of child pornography in October 2016, and was accessing the account on an electronic device, portable or fixed, from inside the home of a registered sex offender. And, the Affidavit provided probable cause to believe that the "lordshackisac" account user possessed child pornography on an electronic device located at 43 Peddlers Lane as recently as October 3, 2017, because that is the date that Yahoo deactivated the account based on child pornography. The search occurred on November 22, 2017, a mere seven weeks later.

The Affidavit provided ample basis to establish probable cause to search the home on the basis of the facts included as to the first upload in October 2016, so long as that information was not stale. And, under the totality of circumstances, the information as to October 2016 was not stale.

In evaluating a staleness challenge, the "fundamental inquiry is whether the alleged facts are so dated that, at the time of the search, it is doubtful that evidence of criminal activity can still be found at the premise searched." *United States v. Johnson*, 865 F. Supp. 2d 702, 705 (D. Md. 2012) (citing *United States v. McCall*, 740 F.2d 1331, 1336 (4th Cir. 1984)). To be sure, "'time is a crucial element of probable cause,' [but] the existence of probable cause cannot be determined 'by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit.'" *Richardson*, 607 F.3d at 370 (quoting *McCall*, 740 F.2d at

1335-36).  Indeed, "[t]he mere lapse of substantial amounts of time is not controlling in a question of staleness."  *United States v. Lacy*, 119 F.3d 742, 745 (9th Cir. 1997) (citation omitted).

Put another way, "Staleness . . . is not a rigid concept; it depends on the particular circumstances of the case."  *Behrel v. Maryland*, 151 Md. App. 64, 88, 832 A.2d 696, 710 (2003), *cert. denied*, 376 Md. 576, 831 A.2d 5 (2003).  Courts must take into account "'all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized.'"  *Richardson*, 607 F.3d at 370 (quoting *McCall*, 740 F.2d at 1336).

In a fraud case, Judge Charles E. Moylan, Jr. aptly said for the Maryland Court of Special Appeals in *Andresen v. State*, 24 Md. App. 128, 172, 331 A.2d 78, 106 (1975), *aff'd*, 427 U.S. 463 (1976) (emphasis added):

> The ultimate criterion in determining the degree of evaporation of probable cause, however, is not case law but reason.  *The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock:*  the character of the crime (chance encounter in the night or regenerating conspiracy?), of the criminal (nomadic or entrenched?), *of the thing to be seized (perishable and easily transferable or of enduring utility to its holder?),* of the place to be searched (mere criminal forum of convenience or secure operational base?), etc.  The observation of a half-smoked marijuana cigarette in an ashtray at a cocktail party may well be stale the day after the cleaning lady has been in; the observation of the burial of a corpse in a cellar may well not be stale three decades later.  The hare and the tortoise do not disappear at the same rate of speed.

"Many courts . . . have given substantial weight to testimony from qualified law enforcement agents about the extent to which pedophiles retain child pornography."  *United States v. Lemon*, 590 F.3d 612, 615 (8th Cir. 2010), *cert. denied*, 560 U.S. 916 (2010).  TFC Donald expressly averred in the Affidavit, based on his training, that people who collect CP retain it indefinitely in their homes.

Significantly, "[i]n the context of child pornography cases, courts have largely concluded that a delay—even a substantial delay—between distribution and the issuance of a search warrant does not render the underlying information stale." *Richardson*, 607 F.3d at 370. Such "consensus rests on the widespread view among the courts . . . that 'collectors and distributors of child pornography value their sexually explicit materials highly, "rarely if ever" dispose of such material, and store it "for long periods" in a secure place, typically in their homes.'" *Id.* (quoting *Lacy*, 199 F.3d at 746); *see also*, *e.g.*, *Morales-Aldahondo*, 524 F.3d at 119 (holding that three-year delay between acquisition of child pornography and application for warrant did not render supporting information stale because "customers of child pornography sites do not quickly dispose of their cache"); *United States v. Watzman*, 486 F.3d 1004, 1008 (7th Cir. 2007) (rejecting challenge to probable cause where three months elapsed between the crime and issuance of the warrant where agent testified child pornographers retain their collected materials for long periods of time); *United States v. Gourde*, 440 F.3d 1065, 1072 (9th Cir. 2006) (en banc) (concluding that "[t]he details provided on the use of computers of child pornographers and the collector profile" provided support for a finding of probable cause); *United States v. Irving*, 452 F.3d 100 (2nd Cir. 2006) (two years); *United States v. Riccardi*, 405 F.3d 852, 861 (10th Cir. 2005) (finding probable cause after five years based, in part, on "the observation that possessors often keep electronic copies of child pornography"); *United States v. Ricciandelli*, 998 F.2d 8, 12 n.4 (1st Cir. 1993) ("[H]istory teaches that collectors [of CP] prefer not to dispose of their dross, typically retaining obscene materials for years); *United States v. Sherr*, 400 F. Supp. 2d 843, 847 (D. Md. 2005) (information in child pornography cases is "less likely to become stale because collectors and traders of child pornography are known to store and retain their collections for extended periods of time.").

*United States v. Ramsburg*, 114 Fed. App'x 78 (4th Cir. 2004) (per curiam), is informative. There, a warrant was obtained to search the defendant's home and, during the search, computer equipment was recovered containing child pornography. *Id.* at 79, 80. The government subsequently disclosed that the affidavit in support of the warrant contained a falsehood. The district court granted the motion to suppress, but the Fourth Circuit reversed. *Id.*

Even with the redaction of the disputed information, the affidavit provided probable cause. *Id.* at 79. It indicated that another e-mail address registered to the defendant had been used to transmit an image of CP several years earlier. *Id.* at 81. The Court rejected the claim of staleness in regard to the 1995 transmission and a search warrant application in 2001 for the defendant's home. *Id.* at 82. The Court reasoned, *id.*:

> We have held . . . that "[t]he vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit." *United States v. McCall*, 740 F.2d 1331, 1336 (4th Cir. 1984) (quoting *United States v. Johnson*, 461 F.2d 285, 287 (10th Cir. 1972)). We have also joined several other courts in emphasizing that findings of staleness become less appropriate when the instrumentalities of the alleged illegality tend to be retained. *See United States v. Farmer*, 370 F.3d 435, 439-40 (4th Cir. 2004). Here the undisturbed portions of the affidavit established that Ramsburg, the registrant of "OriolesGuy," had possessed and distributed an image of child pornography. And, as [Special Agent] Kornek averred to Magistrate Grimm, most collectors of child pornography "rarely . . . dispose of their sexually explicit materials." *See also United States v. Lacy*, 119 F.3d 742, 746-46 (9th Cir. 1997) (noting that possessors of child pornography are unlikely to promptly dispose of it).

> \* \* \*

> It is no defense that the affidavit contained only one allegation of a prior transmission of only one illicit image. Given the evident difficulty of obtaining child pornography, it is very unlikely that an individual would acquire a single image mistakenly or on a whim. And it is even more improbable that an unknowing or casual possessor would e-mail his lone image to another internet user. The earlier distribution from an e-mail account traced to Ramsburg thus strongly suggests that he was a collector of child pornography.

Staleness is shorthand for the notion that some evidence of wrongdoing is so old that it cannot support probable cause of its own. The concept does not automatically ban from warrant affidavits information of a certain vintage, as appellee would have it. Indeed some information that may be stale standing alone becomes an appropriate basis for a probable cause determination when viewed in light of relatedly suspicious behavior. The prior transmission of an illicit image was a proper consideration in the totality of the circumstances inquiry mandated by *Gates*. This information, together with appellee's membership in Candyman and Shangri_la, [internet groups whose primary purpose was to facilitate distribution of CP] was sufficient to establish a fair probability that Ramsburg's domicile contained evidence of a crime.

*Richardson*, 607 F.3d at 357, another child pornography case, also provides guidance. Richardson argued that the search warrant was based on stale information and thus there was no probable cause. *Id.* at 369. He claimed that "the fatal flaw" in the affidavit was the failure to specify the date on which he possessed or emailed the images. And, he claimed that the only information included to "'freshen'" the probable cause was "boilerplate" information about "the general tendencies of child pornography collectors" to "'rarely, if ever, dispose'" of their CP. *Id.* (citation omitted).

The Court reiterated, *id.* at 370: "Although 'there is no question that time is a crucial element of probable cause,' *McCall*, 740 F.2d at 1335, the existence of probable cause cannot be determined 'by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit,' *id.* at 1336 (internal quotation marks omitted). Instead, we 'look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized.'" *Id.*

I also reject any claim that, to justify a search of defendant's home, the Affidavit had to establish that the upload occurred in the home. There is wide access to the Internet from portable electronic devices. For example, the Supreme Court has described cell phones as "minicomputers" with "immense storage capacity . . . ." *Riley v. California*, 134 S. Ct. 2473,

2489 (2014). This does not mean, however, that a cell phone used in various locales would not be found in one's home. And, as to a laptop computer or an ipad device, "common sense dictates that a computer containing illicit images would be *stored* in a private home," even if used elsewhere. *Johnson*, 865 F. Supp. 2d at 708 (emphasis added).

Moreover, it is widely understood that "the age of information supporting a warrant is increasingly irrelevant when the object searched is stored on a computer," because "evidence on a computer is recoverable months or years after it has been downloaded, deleted, or viewed." *Johnson,* 865 F. Supp. 2d at 707; *see also Gourde*, 440 F.3d at 1071 ("Thanks to the long memory of computers, any evidence of a crime was almost certainly still on [the defendant's] computer, even if he had tried to delete the images); *United States v. Toups*, No. 2:06-cr-112-MEF, 20007 WL 433562, at *4 (M.D. Ala. Feb. 6, 2007) ("Further bolstering the conclusion that the staleness calculation is unique when it comes to cases of Internet child pornography is the images and videos stored on a computer are not easily eliminated form a computer's hard drive. The mere deletion of a particular file does not necessarily mean that the file cannot later be retrieved."). And, as indicated earlier, numerous cases are consistent with Donald's assertion in the Affidavit that people who collect child pornography usually retain it.

I readily conclude that the information as to the upload in October 2016 was not stale.

## V. Conclusion

The totality of circumstances, coupled with the reasonable, commonsense inferences that Judge Whelan was permitted to draw from the factual allegations, were more than adequate to establish a "fair probability" that child pornography would be found on electronic devices present at the home of the defendant at the time the search warrant was executed. Therefore, the Motion (ECF 19) is denied.

An Order follows.

Date:  October 24, 2018          _____/s/_____

Ellen L. Hollander
United States District Judge