IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.

FREDDIE EMERSON CROCKETT,

*Defendant*.

Criminal Action No. ELH-18-166

**MEMORANDUM OPINION**

This Memorandum Opinion concerns a renewed motion for compassionate release filed by counsel on behalf of defendant Freddie Emerson Crockett, pursuant to 18 U.S.C. § 3582(c)(1)(A). ECF 63 ( "Motion").  He is currently serving a 120-month sentence at FCI Petersburg Medium for a conviction of one count of possession of child pornography.  That sentence corresponds to the Congressionally mandated minimum sentence.

By Memorandum Opinion (ECF 61) and Order (ECF 62) of September 25, 2020, the Court previously considered and denied defendant's earlier request for compassionate release.  ECF 47; ECF 50 (collectively, the "First Motion").[1]  Although I found that in light of the COVID-19 pandemic, Crockett's health conditions qualified him for compassionate release, I determined that the sentencing factors set forth in 18 U.S.C. § 3553(a) weighed against granting defendant the relief he sought.

In the Motion, defendant urges the Court to reduce his term of imprisonment to time served and to add a period of home confinement as a condition of his supervised release.  ECF 63 at 1.  In support, he notes that he contracted COVID-19 in late December 2020.  *Id.*  And, he claims that, as a result of his underlying health conditions, COVID-19 poses a heightened risk to his health.

_____

[1] Defendant initially filed a pro se request for compassionate release.  ECF 47.  It was subsequently supplemented by the Office of the Federal Public Defender.   ECF 50.

*Id.* at 2.   Further, defendant assures the Court that he will participate in sex offender treatment upon his release, which, in conjunction with the strict terms of his supervised release, should assuage any concern the Court may harbor regarding the danger that defendant's release might pose to the public. *Id.*

The government opposes the Motion (ECF 69, the "Opposition"), supported by two exhibits.  ECF 69-1; ECF 69-2.  As a threshold issue, the government claims that the Court should deny the Motion for failure to exhaust.  ECF 69 at 3-5.  It also argues that Crockett's health does not constitute an extraordinary and compelling reason for relief, and that, in any event, the sentencing factors set forth in 18 U.S.C. § 3553(a) weigh against defendant's release at this time. *Id.* at 5-11.

Defendant has replied.  ECF 73 (the "Reply").  The Reply is supported by one exhibit. ECF 73-1.

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall deny the Motion, without prejudice.

### I. Background[2]

On March 27, 2018, a grand jury sitting in the District of Maryland returned an Indictment charging Crockett with one count of possession of child pornography, in violation of 18 U.S.C. § 2252(b)(2).  ECF 1. The Indictment also contained a "Special Allegation," which alleged that on or about December 1, 2010, Crockett was convicted in the Circuit Court for Cecil County, Maryland of two counts of conducting visual surveillance with prurient intent. *Id.*

Crockett was initially arrested on November 22, 2017, on State charges.  Those charges

---

[2] Where appropriate, I have drawn on the factual background of this case, as recounted in my  Memorandum Opinion of September 25, 2020.  ECF 61 at 1-5.

were later dismissed.  But, Crockett has been in custody since that date.

Pursuant to a Plea Agreement (ECF 33), Crockett entered a plea of guilty in this Court on December 13, 2018, to possession of child pornography, in violation of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2).  ECF 32.  The offense at issue carries a mandatory minimum term of imprisonment of ten years. ECF 33, ¶ 3.  The plea was tendered pursuant to Fed. R. Crim. P. 11(c)(1)(C).  *Id.* ¶ 9. Under the Plea Agreement, the parties agreed to a term of imprisonment ranging from 120 months, *i.e.*, the mandatory minimum, up to 135 months in prison.  *Id.*  The Plea Agreement also included a stipulation as to relevant conduct committed by defendant: transportation of child pornography, in violation of 18 U.S.C. § 2252(a)(1) and (b)(1).  *Id.* ¶¶ 6g-6m.

According to the factual stipulation, *id.* at 11-13, on October 20, 2016, the defendant knowingly uploaded at least 25 images depicting child pornography to the social networking site "Flickr."  *Id.* at 11.  Flickr is an online image-storage service provided by Yahoo, Inc. *Id.*  Nearly one year later, on October 3, 2017, Yahoo deactivated the Flickr account that Crockett had used to upload the images.  *Id.*  That day, Crockett created a new Flickr account, registered to a different email address.  *Id.*  Sometime between October 3 and October 24, 2017, the defendant uploaded four images to that account, depicting child pornography.  *Id.*

On October 4, 2017, Yahoo reported to the National Center for Missing and Exploited Children ("NCMEC") that someone using the first of the two aforementioned Flickr accounts had uploaded to Flickr "133 files containing possible child pornography."  *Id.*  Thereafter, on October 16 and October 24, 2017, Yahoo reported to NCMEC additional information about both of those Flickr accounts.  *Id.*

In October 2017, NCMEC, in turn, provided the Maryland State Police ("MSP") with the information it received from Yahoo.  *Id.* at 11-12.  The MSP determined that the internet protocol

address from which the last login to one of the Flickr accounts originated was assigned to an internet subscriber located at the same address as the defendant's Maryland sex offender registration. ECF 33 at 11-12.

Law enforcement officers executed a search warrant at Crockett's residence in Earleville, Maryland on November 22, 2017. *Id.* at 12. Crockett voluntarily waived his *Miranda* rights and agreed to speak with the officers. *Id.* He admitted that the two Flickr accounts under investigation were his, and that he used a smartphone and laptop located in the residence. *Id.* After law enforcement located several images depicting child pornography on a memory card in the smartphone during an "on-scene forensic preview," officers seized the smartphone, memory card, and laptop. *Id.* A forensic review located a total of 123 images depicting child pornography on all three of the devices. *See id.* At least 75 of those images had been uploaded to one of Crockett's Flickr accounts, and at least three depicted prepubescent minors under the age of twelve. *Id.* at 12-13.

According to the stipulation, on December 1, 2010, defendant was convicted in the Circuit Court for Cecil County of two counts of conducting visual surveillance with prurient intent of an individual in a private place, without consent, in violation of Md. Code (2012 Repl. Vol.), § 3-902(c)(1) of the Criminal Law Article. *Id.* Further, the stipulation stated: "The two convictions related, respectively, to Crockett's surreptitious recording, on separate occasions, of a 13-year-old female and a 16-year-old female while they were changing clothes inside a bathroom at his residence." *Id.*[3]

The Presentence Report ("PSR," ECF 36) determined that defendant had a final offense level of 30. *Id.* ¶ 38. And, he had a Criminal History Category of II. The advisory Sentencing

---

[3] Additional facts were included in the government's sentencing memorandum. ECF 37.

Guidelines ("Guidelines" or "U.S.S.G.") called for a sentence ranging between 108 and 135 months of incarceration.  ECF 36, ¶ 66.  However, as noted, under 18 U.S.C. § 2252(a)(4)(B) and (b)(2), the offense carries a mandatory minimum term of imprisonment of ten years.  *Id.* ¶ 65.  As a result, under U.S.S.G. § 5G1.1(c)(2), the Guidelines for Crockett's sentence increased to 120 to 135 months of imprisonment.  *Id.* ¶ 66.  That range corresponded to the terms of the C plea.  *See* ECF 33, ¶ 9.

Sentencing was held on March 26, 2019.  ECF 41.  At the time of sentencing, the defendant was 40 years of age.  According to the PSR, Crockett claimed that he was diagnosed with Diabetes in 2017 and also has high blood pressure.  ECF 36, ¶ 54.  Additionally, the PSR indicated that Crockett "has had mental health issues his whole life."  *Id.* ¶ 55.  In particular, "[a]round the age of 12, [Crockett] was diagnosed with Bi-Polar Disorder II, Oppositional Defiant Disorder (ODD), Attention Deficit Disorder (ADD), Attention Deficit Hyperactivity Disorder (ADHD), and Suicidal Tendencies."  *Id.*  Additionally, sometime in 2014,  defendant "struck and killed a pedestrian while he was driving and he was diagnosed with Post-Traumatic Stress disorder (PTSD) following the tragic event."  *Id.*

At sentencing, the government asked the Court to impose a sentence of 135 months' incarceration.  ECF 37 at 1.  Ultimately, however, the Court adopted the position of defense counsel (ECF 39 at 1), and sentenced Crockett to a term of imprisonment of 120 months, with credit for time served since November 22, 2017. ECF 44 (Judgment) at 2-3.  In addition, the Court imposed a period of lifetime supervised release. *Id.*[4]

---

[4] Among other things, Crockett must: (1) register as a sex offender, pursuant to the Sex Offender Registration and Notification Act, 34 U.S.C. § 20901, et seq., as well as Maryland law; (2) may not have direct contact with any minor without the permission of the probation officer; (3) submit his computers (as defined in 18 U.S.C. § 1030(e)(1)) or other electronic communications or data storage devices or media, to a search; (4) allow the probation officer to install computer

Defendant is now 43 years old, *see* ECF 36 at 2, and is presently incarcerated at FCI Petersburg Medium. *See Find an inmate.*, FED. BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last accessed June 10, 2022).[5]  He has served approximately 46% of his sentence.  Anticipating credit for good time, defendant has a projected release date of May 31, 2026.  *See id.*; *see also* ECF 69-2

On May 6, 2020, Crockett submitted a pro se "Request for Compassionate Release/Reduction in Sentence" to the Warden of FCI Petersburg, pursuant to 18 U.S.C. § 3582(c)(1)(A).  ECF 47-1.  On May 27, 2020, the Warden of FCI Petersburg denied defendant's request.  ECF 56-2.  In the interim, defendant submitted a motion for compassionate release on May 13, 2020 (ECF 47), that was later supplemented by the FPD on July 17, 2020.  ECF 50.g

By Memorandum Opinion (ECF 61) and Order (ECF 62) of September 25, 2021, the Court denied the First Motion.  I recognized that, in light of the COVID-19 pandemic, defendant's health conditions, presented an extraordinary and compelling reason to grant Crockett relief.  *Id.* at 15-16.  Nonetheless, I found that Crockett would pose a danger to the community if released, and that the nature of Crockett's offense, coupled with the amount of time served, weighed heavily against his release.  *Id.* at 18-19.

On January 5, 2021, defense counsel submitted the Motion.  ECF 63.  Significantly, defendant notes that he contracted COVID-19 on or about December 30, 2020, and that, in light of his qualifying medical conditions, he has an elevated risk of severe illness.  *Id.* at 1-2.  In support of defendant's assertion, he has provided health records that corroborate that he contracted

---

monitoring software on any computer (as defined in the above statute) Crockett uses; (5) participate in a mental health treatment program; and (6) participate in a sex offense-specific treatment program.  ECF 44 at 3-4.

[5] The Court recommended FCI Petersburg at defendant's request.  *See* ECF 44.

COVID-19, and indicate that he has been diagnosed with hypertension and type II diabetes mellitus with diabetic neuropathy, among other conditions.  *See* ECF 65 at 2, 15, 18.

Notably, defendant did not submit a new request for compassionate release to the Warden prior to filing the Motion in January 2021.  However, Crockett submitted a request to the Warden of FCI Petersburg Medium on September 8, 2021.  *See* ECF 73 at 3; *see* ECF 73-1.  The record does not reflect whether the Warden ever responded to the request.

## II.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C.    § 3582(c)(1)(B);    *see    Jackson*,    952    F.3d    at    495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i); *see Hargrove*, 30 F.4th at 194. This provision is an exception to the ordinary rule of finality.  *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the Bureau of Prisons ("BOP").  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g.*, *Orlansky v. FCI Miami*

*Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  So, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, he or she may petition a court directly for compassionate release.  *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.  That option constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are applicable," it finds:

(i) extraordinary and compelling reasons warrant such a reduction; or

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam); *see also Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.  Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169.  But, the Fourth Circuit has said that, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and

compelling reasons" that might merit compassionate release.  *See McCoy*, 981 F.3d at 276-77.[6]  In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category."  *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act.  *McCoy*, 981 F.3d at 276.  Of significance here, it is only "directed at BOP requests for sentence reductions."  *Id.* (citing U.S.S.G. § 1B1.13).  "By its plain terms, in short, § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States*

---

[6] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy,* 981 F.3d at 276.

*v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020). In other words, the policy statement does not apply to this Court.

Indeed, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also Hargrove*, 30 F.4th at 194-95. Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197. But, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam); 28 U.S.C. § 994(t). However, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *Harris*, 2022 WL 636627, at *1.

Moreover, the Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169. However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187. Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to

compassionate release, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020). But, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *see also United States v. Butts*, No. 21-6380, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors); *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021) (court must consider the § 3553(a) factors).

As mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant. *McCoy*, 981 F.3d at 284 (citation omitted); *see Jenkins*, 22 F.4th at 169. Nevertheless, compassionate release is a "rare" remedy. *White v.*

*United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94;

*United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16,

2020).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every

§ 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers

a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*,

___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187.  But, a district court abuses

its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized

factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises,"

or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted).

### III.   COVID-19[7]

The World Health Organization declared COVID-19 a global pandemic on March 11,

2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[8]  COVID-19 spawned

"a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA*

*v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*,

2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths,

according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first

cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S.*

---

[7] The Court may take judicial notice of matters of public record. *See* Fed. R. Evid. 201.

[8] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of
coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease
and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW (last accessed June
15, 2020).

*COVID deaths after losing political battles*, REUTERS (May 12, 2022), https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/. And, as of June 10, 2022, COVID-19 has infected more than 85 million Americans. *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed Jun. 10, 2022).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt. For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. The judiciary, too, faced many operational challenges.

People who are stricken with the virus sometimes experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus. The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16. But, the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. In May 2022, it updated its guidance to reflect the most available data. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 2, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See At Increased Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1. Furthermore, "[t]he risk of

severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195. In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196.

Particularly at the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed May 31, 2022). However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020). And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954

F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[9]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend

---

[9] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://www.nytimes.com/2020/06/16/us/coronavirus-inmates-prisons-jails.html; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems.*" America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum to implement the Attorney General's directives on the increased use of home confinement. The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve. And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson).[10] Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders. But, the criteria for eligibility has since been approved for all persons five years of age and older. *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC News, Oct. 29, 2021, https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188. Approximately 67% of the total U.S. population is fully vaccinated, including 29% of people from

---

[10] Questions as to the efficacy of the Johnson & Johnson vaccine were raised as to the Delta and Omicron variants. *See J&J, Sinopharm, Sputnik V COVID-19 shots less effective against Omicron -study*, Reuters (Dec. 17, 2021), https://www.reuters.com/business/healthcare-pharmaceuticals/jj-sinopharm-sputnik-v-shots-weaker-against-omicron-study-shows-2021-12-17/; Apoorva Mandavilli, *J.&J. Vaccine May Be Less Effective Against Delta, Study Suggests*, N.Y. Times (July 20, 2021), https://www.nytimes.com/2021/07/20/health/coronavirus-johnson-vaccine-delta.html.

ages 5 to 11, 60% of people from ages 12 to 17, 73% of people from ages 18 to 64, and 91% of people age 65 and up. *See How Vaccinations Are Going in Your County and State*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited Jun. 10, 2022).

Moreover, approximately 104.1 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older. *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated May 27, 2022). And, federal regulators recently approved a second booster dose for individuals age 50 and older. *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999. To date, 14.1 million Americans have received a second booster dose. *See COVID-19 Vaccine Booster Shots*.

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of June 10, 2022, the

BOP had 139,787 federal inmates in BOP-managed institutions and 13,681 in community-based facilities.  BOP maintains approximately 36,000 staff.  And, by June 10, 2022, the BOP had administered 320,257 vaccine doses to staff and inmates.  *See* https://www.bop.gov/coronavirus/ (last accessed Jun. 10, 2022).

For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept. 1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region.").  But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.  *See also Eden LLC v. Justice*, ___ F.4th ___, 2022 WL 1790282, at *4 (4th Cir. June 2, 2022) (noting the sequential "deadly surges in COVID-19 cases caused by the Delta and Omicron variants").

The Delta variant was thought to be more virulent than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION,  https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html  (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants");  *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021),

https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August

14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, both around the world and in the

United States.  It sparked further cause for concern, because it was highly contagious.  *See Omicron*

*Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION,

https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13,

2021).  Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases.  *See,*

*e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN

(Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

Then, the number of COVID-19 cases again declined.  *See, e.g.*, Anabelle Timsit, *U.S.*

*coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST (Feb. 7,

2022),          https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-

updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y.    And, the country began to return to

normalcy.

Nevertheless, we are once again experiencing a surge in COVID-19 cases.  *See, e.g.*, Anne

Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022),

https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-

should-we-be.html.  Indeed, a new subvariant of the virus is "spreading rapidly and will probably

become the dominant form of the virus in the United States in the next few weeks."   *See* Isabella

Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9,

2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases.  And,

the "Biden administration is preparing for the possibility that 100 million Americans will be

infected with the coronavirus this fall and winter . . . ."  Amelia Nirenberg, *A Coming Fall Surge?*,

N.Y. TIMES (May 9, 2022), https://www.nytimes.com/2022/05/09/briefing/100-million-coronavirus-covid-us.html.

As of June 10, 2022, the BOP reported that 167 federal inmates, out of a total population of 139,787, and 309 BOP staff, out of some 36,000 staff members, currently tested positive for COVID-19. Moreover, 50,906 inmates and 12,817 staff have recovered from the COVID-19 virus. In addition, 296 inmates and seven staff members have died from the virus. The BOP has completed 128,719 COVID-19 tests. *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to Petersburg Medium FCI, the BOP reported that as of June 10, 2022, out of a total of 1,597 inmates, zero inmates or staff have tested positive, one inmate has, tragically, died of COVID-19, and 249 inmates and 44 staff have recovered at the facility. In addition, across Petersburg Medium FCI and Petersburg Low FCI, 475 staff members and 2,450 inmates have been inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/pem/, https://www.bop.gov/locations/institutions/pet/ (last visited Jun. 10, 2022).

## IV.   Discussion

In the Motion, defendant argues that his recent COVID-19 infection, coupled with his underlying health conditions, amount to an extraordinary and compelling circumstance that warrants his release. ECF 63 at 2. And, Crockett maintains that the sentencing factors favor his release at this juncture, particularly given that he has asked the Court to impose a substantial period of home confinement as a condition of supervised release. *Id.* at 3. Further, defendant claims that BOP's policies presently bar him from accessing sex offender treatment. *Id.* But, if released, he could safely undergo similar treatment, in accordance with the strict conditions of his supervised release and under the supervision of the United States Probation Office. *Id.*

23

In response, the government urges the Court to deny the Motion, claiming that defendant failed to exhaust his administrative remedies prior to renewing his request for compassionate release. *See* ECF 69 at 3.  Further, it claims that defendant's health conditions no longer present an extraordinary and compelling circumstance because defendant has been fully vaccinated against COVID-19, and when defendant contracted COVID-19, he experienced only mild symptoms. *Id.* at 5-6.

The government also asserts that the sentencing factors set forth in 18 U.S.C. § 3553(a), such as the nature of defendant's offense, and his time served to date, weigh against Mr. Crockett's release. *Id.* at 10.  Moreover, it denies that BOP policy bars Crockett from participating in sex offender treatment during his term of incarceration. *Id.* at 9 n.3.

### A. Exhaustion

As an initial matter, the government argues that Crockett has failed to satisfy the exhaustion requirements of the compassionate release statute. ECF 69 at 3. Specifically, the government points out that, after the Court denied the First Motion and before defendant filed the Motion, defendant did not submit a new request with the Warden of FCI Petersburg. *Id.* at 3.   According to the government, each successive motion must independently satisfy the exhaustion requirement set forth in 18 U.S.C. § 3582(c)(1)(A). *Id.*

 Defendant counters that his initial request to the Warden effectively exhausted his administrative remedies. ECF 73 at 2.  In defendant's view, ample case law demonstrates that a defendant need not "re-exhaust" his administrative remedies before submitting a renewed motion for compassionate release that presents arguments substantially similar to those advanced in an earlier request. *Id.* at 2.  Crockett also notes that even if each motion for compassionate release must satisfy the exhaustion requirement, defense counsel submitted a new request with the Warden

on September 8, 2021.  *Id.* at 3; *see* ECF 73-1.  Thus, according to Crockett, he satisfied the exhaustion requirement by October 8, 2021.  ECF 73 at 3.

The Motion is styled as a "Renewed Emergency Motion For Compassionate Release" under 18 U.S.C. § 3582(c)(1)(A).  ECF 63.  In my view, however, it constitutes a new motion for compassionate release.  Indeed, defendant does not suggest otherwise. Further, Crockett argues that a "changed circumstance," namely his recent COVID-19 infection, justifies his release at this juncture.  *Id.* at 2.  Therefore, because the Motion marshals new, albeit similar, grounds for relief, I am persuaded that it amounts to new motion for compassionate release.

As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  Once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release. *See*, *e.g.*, *Jenkins*, 22 F.4th at 169 ("Congress enacted the First Step Act to allow incarcerated individuals to directly petition district courts for compassionate release so long as they first exhaust their administrative remedies.").

The Fourth Circuit has reiterated that the exhaustion requirement "is a non-jurisdictional claim-processing rule," rather than a jurisdictional provision. *Muhammad*, 16 F.4th at 130.  This means that it can be "waived if it is not timely raised." *Id*. at 129.  Here, however, the government has raised it.  *See* ECF 69 at 3-4.

Defendant argues that there is no express requirement in 18 U.S.C. § 3582(c)(1)(A) that specifies a prisoner must exhaust his administrative remedies before filing a successive motion for

compassionate release. ECF 73 at 2. And, Crockett states, *id.*: "There is ample case law permitting a second or subsequent compassionate release petition without additional exhaustion where, like here, the grounds for relief are similar in nature to those included in the previous request." However, the cases cited by him to support his position are inapposite.

For instance, Crockett cites to *United States v. Miller*, 453 F. Supp. 3d 1062 (E.D. Mich. 2020), in support of his position. In that case, the defendant submitted a petition for compassionate release in the fall of 2018 with the warden of the institution where he was imprisoned, asserting that his old age and health conditions warranted his release. *Id.* at 1064. The warden denied his petition. *Id.* The defendant twice appealed that decision to the warden, without success. *Id.* The warden found that, among other things, the defendant's condition "remained stable." *Id.* Thereafter, in March 2020, at the outset of the COVID-19 pandemic, the defendant's family asked the court to release the defendant, which the court construed as a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A). *Id.* at 1063.

As relevant, the government argued that the court should deny the motion on exhaustion grounds. The court rejected the contention as "unfounded," explaining that the defendant "then and now, seeks release due to his myriad of serious health conditions." *Id.* Critically, however, the motion before the court represented the first instance in which the district court had considered defendant's request for compassionate release.

In other words, *Miller* did not involve a circumstance where, like here, the district court previously rejected a motion for compassionate release, and defendant subsequently filed a successive motion without first submitting an intervening petition with the warden of the institution where he is imprisoned. *See* ECF 73 at 2-3. Indeed, Crockett has not provided the

Court with any authority to establish that, given the circumstances attendant here, he has satisfied the exhaustion requirement set forth in 18 U.S.C. § 3582(c)(1)(A).

As best I can determine, the Fourth Circuit has not conclusively resolved whether a defendant must independently satisfy the exhaustion requirement set forth in 18 U.S.C. § 3582(c)(1)(A) prior to filing a successive motion for compassionate release. But, at least one federal circuit court has indicated that each compassionate release motion must independently satisfy the exhaustion requirement. *See United States v. Keller*, 2 F.4th 1278, 1283 (9th Cir. 2021) ("But the July 2020 request served as the predicate for [the defendant's] first motion in the district court, which was denied in September 2020, and could not have initiated the administrative process for his January 2021 motion, which was itself premised on [the defendant's] claim of changed circumstances."). Other district court decisions are to like effect. *See, e.g., United States v. Ramirez*, 14-cr-00249-PAB-2, 2022 WL 1092180, at *3 (D. Colo. Apr. 12, 2022); *United States v. Coe*, 1:18-CR-59-HAB, 2022 WL 704920, at *1 (N.D. Ind. Mar. 8, 2022); *United States v. Ezukanma*, 3:15-CR-0254-B-1, 2021 WL 389827, at *2 (N.D. Tex. Feb. 4, 2021); *United States v. Cain,* 1:16-cr-00103-JAW-1, 2021 WL 388436, at *4-5 (D. Me. Feb. 3, 2021). Indeed, judges within this Circuit have reached the same conclusion. *See also United States v. Huitt*, 3:16-cr-206-MOC, 2021 WL 2226486, at *2 (W.D.N.C. Jun. 2, 2021) (collecting cases).

In *Huitt*, Judge Cogburn explained, 2021 WL 2226486, at *2, that the exhaustion "requirement serves an important purpose: it 'provide[s] BOP with the first opportunity to evaluate a prisoner's request,' consistent with Congress's determination that 'BOP, not the Court, is better positioned to first evaluate a defendant's request and consider whether modification of a term of imprisonment is appropriate.'" (quoting *United States v. Beahm*, 1:05-CR-249, 2020 WL 4514590, at *1 (E.D. Va. Aug. 5, 2020) (alteration in *Huitt*)). Thus, "[c]onstruing the exhaustion

requirement as motion-specific is consistent with § 3582(c)(1)(A)'s plain language and statutory framework." *Huitt*, 2021 WL 2226486, at *2 (citing *Cain*, 2021 WL 388436, at *4). In light of the foregoing authority, I am persuaded that Crockett was required to exhaust his administrative remedies for compassionate release before filing a new motion with the Court.

Nevertheless, the issue of exhaustion is ultimately an academic one. As noted, on September 8, 2021, defendant submitted a petition for compassionate release to the Warden, on the grounds set forth in the Motion. ECF 73-1. The Court has not been presented with any evidence indicating whether the Warden responded. But, under 18 U.S.C. § 3582(c)(1)(A), a defendant exhausts his administrative remedies where a warden fails to respond within thirty days of receipt of a prisoner's request for compassionate release. Therefore, by October 8, 2021, at the latest, defendant exhausted his administrative remedies. Although the remedies were exhausted after the Motion was filed, it was well before the Court considered the Motion.

### B. Extraordinary and Compelling Circumstance

As mentioned, the Motion is predicated on defendant's vulnerability to COVID. To that end, defendant has provided the Court with copies of his medical records. ECF 65. The records reveal that Crockett has numerous underlying health conditions, such as hypertension and diabetes. *Id.* at 40; *see also* ECF 71 at 5-6. In addition, the PSR reflected that defendant suffers from numerous mental health issues, such as bipolar disorder. ECF 36, ⁋ 56; *see also* ECF 71 at 10 (noting that defendant has major depressive disorder).

Moreover, the PSR indicated that defendant is six feet, three inches tall. ECF 36, ⁋ 56. And, defendant's medical record reflects that, as of May 20, 2021, he weighed 258 pounds. ECF 71 at 41. Thus, according to the most up-to-date information made available to the Court, Crockett has a BMI of 32.2, thereby rendering him obese. *See Adult BMI Calculator*, CTRS. FOR DISEASE

CONTROL AND PREVENTION, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (last accessed Jun. 7, 2022).

According to the CDC, obesity, hypertension, diabetes, and mood disorders, such as bipolar disorder, are among the conditions that "can make you more likely to get very sick from COVID-19." *Certain Medical Conditions, supra*.  In addition, the CDC cautions that "[a] person's risk of severe illness from COVID-19 increases as the number of underlying medical conditions they have increases." *Id.*

The government does not dispute that defendant suffers from the aforementioned health conditions.  Rather, the government argues that COVID-19 no longer presents a risk to Crockett because he previously contracted the disease and did not suffer severe symptoms.  ECF 69 at 5-6; *see* ECF 71 at 14, 20, 24.  Further, the government points out that Crockett has been fully vaccinated against COVID-19.  ECF 69 at 5-7; *see* ECF 71 at 58.

The government's position is not persuasive.  Indeed, the fact that Crockett has been fully vaccinated against COVID-19 "does not negate that his underlying health conditions make him eligible for compassionate release." *Spriggs*, 2021 WL 1856667, at *3.  As Judge Grimm said in *United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. July 29, 2021):  "It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specific medical issues."

Moreover, as illustrated above, the future trajectory of the COVID-19 pandemic is anything but predictable. In particular, the Court is mindful that the CDC has confirmed that breakthrough infections of COVID-19 among vaccinated individuals occur and, albeit in rare cases, they can result in death. *See Rates of COVID-19 Cases and Death by Vaccination Status*, CNTRS. FOR DISEASE   CONTROL,   Mar.   17,   2022, https://covid.cdc.gov/covid-data-tracker/#rates-by-

vaccine-status (last accessed May 11, 2022).  Indeed, a recent analysis of "nationwide data from the Center for Disease Control and Prevention" revealed that "[t]he vaccinated made up 42 percent of fatalities in January and February [of 2022,] during the highly contagious omicron variant's surge, compared with 23 percent of the dead in September, the peak of the delta wave."   Fenit Nirappil & Dan Keating, *Covid deaths no longer overwhelmingly among the unvaccinated as toll on elderly grows*, WASH. POST (Apr. 29, 2022), https://www.washingtonpost.com/health/2022/04/29/covid-deaths-unvaccinated-boosters/.

To that end, the CDC issued recommendations encouraging everyone ages 12 years and older to receive one COVID-19 booster shot after completing their primary COVID-19 vaccination series.  *See COVID-19 Vaccine Boosters*, CTRS. FOR DISEASE CONTROL, https://bit.ly/3MdQMM6 (last updated May 6, 2022).  Moreover, all adults ages 50 years and older are eligible for a second booster shot.  *See id.*  And, the parties have not presented the Court with any evidence regarding whether defendant has received a booster.

Several judges of this Court have concluded that vaccination status does not render an inmate ineligible for compassionate release.  *See e.g.*, *United States v. Hegie*, RDB-14-411, 2022 WL 605383, at *2 (D. Md. Mar. 1, 2022) (finding that, in light of the COVID-19 pandemic, a fully vaccinated defendant who suffered from obesity and asthma presented an extraordinary and compelling reason for his release); *United States v. Coleman*, PWG-17-393, WL 356724, at *3 (D. Md. Feb. 7, 2022) (determining that, in light of the dynamic nature of the COVID-19 pandemic and the absence of any information concerning the inmate's vaccination status, defendant's underlying medical conditions qualified as an extraordinary and compelling reason for his release); *United States v. Rivas*, TDC-19-0417, 2022 WL 36941, at *2 (D. Md. Jan. 4, 2022) (explaining

that vaccinated defendant who was a paraplegic and suffered from frequent urinary tract infections could satisfy the extraordinary and compelling prong of the analysis).

In addition, a defendant's eligibility for compassionate release is not defeated because a defendant has had COVID-19. What Judge Chuang said in *United States v. Fletcher*, TDC-05-0179, 2020 WL 3972142, at *3 (D. Md. July 13, 2020), is apt: "Although [the defendant] may now be less vulnerable or immune from coronavirus, there is no certainty about whether individuals who have already had COVID-19 now have immunity." *See also United States v. Corey*, JKB-09-0512, 2020 WL 5913238 at *2 (D. Md. Oct. 6, 2020) (highlighting that "it remains unknown . . . what sort of future complications an individual . . . might suffer following an apparent recovery"); *United States v. Heyward*, PWG-17-0527, 2020 WL 3547018, at *2 (D. Md. June 30, 2020) (noting in grant of compassionate release to individual who had survived the virus "that a secondary contraction of COVID-19 is possible").

Accordingly, given defendant's underlying health conditions, he is eligible for compassionate release.  That does not end the inquiry, however.

### C.  Sentencing Factors

Even when a court finds extraordinary and compelling reasons for compassionate release, relief is only warranted under 18 U.S.C. § 3582(c)(1)(A) if appropriate in light of the factors set forth in 18 U.S.C. § 3553(a).  *See High*, 997 F.3d at 186.  The § 3553(a) factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; and (4) any pertinent Sentencing Commission policy statements.

As set forth in the Court's prior Memorandum Opinion, defendant committed an undoubtedly serious offense. ECF 61 at 16.  Although Crockett pleaded guilty to just one count of possession of child pornography, he stipulated to facts that also established the commission of the offense of transportation of child pornography.  ECF 33.  In particular, Crockett stipulated to uploading at least 75 images to the internet, via a Flickr account, several of which depicted prepubescent minors.  *Id.* at 12-13.

Moreover, Crockett's criminal history remains of concern to the Court.  Crockett was convicted in 2010 on charges involving two minors.  ECF 36, ¶ 42.  For these charges, he received suspended sentences, and a five-year term of probation.  *Id.* Significantly, that earlier prosecution did not deter the defendant from engaging in the conduct that led to his federal prosecution.

Additionally, Crockett has served only about 46% of the ten-year sentence that the Court initially imposed.  And, this sentence was the minimum sentence that the Court could render, and at the bottom of the applicable Guidelines range.  *Id.* ¶¶ 65-66.  In my view, defendant's release at this juncture would not adequately reflect the seriousness of his criminal conduct.

Regarding the need to protect the public from further crimes of defendant, the Court is aware that, as of the date of filing the First Motion, defendant had not incurred any disciplinary infractions while incarcerated.  ECF 52 at 18; *see* ECF 52-5 (disciplinary history).  Moreover, in the First Motion, Crockett claimed that he had a "stable release plan."  ECF 52 at 18.  Specifically, counsel confirmed that, upon his release, Crockett would be able to live with his mother and aunt in Earleville, Maryland upon his release, where "there are no minor children . . . and there will not be in the future."  *Id.*; *see* ECF 52-6 (letter from defendant's mother).[11]  Further, defendant claims,

_____

[11] Defendant did not resubmit the exhibits that were appended to the First Motion.  Nor has the Court been provided with more current information regarding defendant's disciplinary history or release plan.

albeit without documentation, that he will "immediately get reconnected with federal disability benefits once he is released which will provide him both with an income and with health insurance so that he can continue to attend to his medical and mental health needs in the community." ECF 52 at 18.

Crockett also claims that the Court could guard against any danger his release may pose to the public by releasing him under "stringent conditions," including a "substantial period" of home confinement. ECF 63 at 2-3. He also asks the Court to impose regular monitoring of his phone and computer, along with the imposition of a sex offender treatment program in conjunction with the United States Probation Office. *Id.* at 3; *see* ECF 73 at 8 (noting that the Judgment requires defendant to obtain mental health treatment and "sex offense-specific treatment as conditions of supervised release"). To that end, Crockett provides, albeit without any corroborating documentation, that his mother has set aside $1,000 to facilitate his access to sex offender treatment upon his release. ECF 63 at 3.

The conditions of defendant's release will hopefully reduce the risk that Crockett will reoffend or pose a danger to the public. Nonetheless, as the government notes, "it is the completion of sex offender treatment that might mitigate the Defendant's dangerousness, not the offer to seek treatment.[ ]" ECF 69 at 9 (emphasis omitted).

Crockett states that he cannot presently access sex offender treatment in prison because BOP policy only allows for offenders to participate in their final three years of imprisonment. ECF 63 at 3. It is true that, as a matter of BOP policy, referrals for sex offender treatment "'ordinarily . . . should be initiated when an inmate has 36 months to projected release.'" ECF 69 at 9 n.3 (quoting BOP Program Statement § 5324.10 at 17). But, as the government points out, that policy does not preclude prisoners from "enroll[ing] in the sex offender treatment program at any time

during the course of their sentence, provided they have sufficient time to complete the program.'" ECF 69 at 9 n.3 (quoting BOP Program Statement § 5324.10 at 16).

Nonetheless, Crockett asserts that the Court should not hold his failure to participate in sex offender treatment against him. ECF 73 at 7-8. He contends: "It would be especially unfair to deny [him] sentencing relief based on an alleged failure to complete certain programming when so much BOP programming has been shuttered during the pandemic due to prolonged and restrictive lockdowns." *Id.* Further, Crockett claims that it remains unclear whether sex offender treatment "is available in the BOP while COVID-19 continues to drastically impact operations." *Id.* at 8.

Certainly, the Court is mindful that the COVID-19 pandemic has curtailed the availability of programming to incarcerated persons like defendant. But, Crockett has been in federal custody since April 2018 (ECF 44 at 2; ECF 36 at 1) and, to the best of my knowledge, he did not participate in sex offender treatment at any time prior to the onset of the ongoing public health crisis in early 2020. Moreover, Crockett has not demonstrated that such treatment is not offered at FCI Petersburg Medium, or that it will not be offered in the foreseeable future. *See Hamilton*, 715 F.3d at 337 (noting that it is defendant's burden to show that his release from prison is warranted under 18 U.S.C. § 3582(c)(1)(A)). In any event, temporary cessation of BOP programming does not itself provide grounds for a sentence reduction under the sentencing factors set forth in 18 U.S.C. § 3553(a). *United States v. Braxton*, JKB-09-0478, 2022 WL 269180 at *2 (D. Md. Jan. 18, 2022) (holding that the suspension of a drug treatment program did not provide an inmate new grounds for sentencing relief).

Defendant maintains that the Court "cannot extend a term of imprisonment for purposes of promoting rehabilitation."  ECF 73 at 7 (citing *Tapia v. Untied States*, 564 U.S. 319 (2011)).  The Court is, of course, mindful of this principle.

Defendant is a repeat offender.  And, regardless of the reason, the fact is that defendant has not participated in sex offender treatment during his incarceration.  *See United States v. Millard*, CR-15-01391-PHX-DGC, 2022 WL 279596, at *6 (D. Ariz. Jan. 31, 2022) (finding that defendant's release could pose a danger to the community where he did not present any "BOP records showing that he has received sex offender treatment while incarcerated"); *United States v. Ewudzi-Acquah*, Crim. No. 16-cr-00317-PAB, 2022 WL 168718, at *3 (D. Colo. Jan. 19, 2022) (similar).  The Court is of the view that, if defendant were released at this time, he would pose a danger to the public.  In light of the abbreviated term of incarceration that defendant has served to date, along with a balancing of the sentencing factors set forth in 18 U.S.C. § 3553(a), defendant's release is not appropriate at this time.

### V. Conclusion

Considering the applicable law under 18 U.S.C. § 3582 and the factors outlined in 18 U.S.C. § 3553(a), I shall deny the Motion, without prejudice.

An Order follows, consistent with this Memorandum Opinion.


Date: June 13, 2022                                    _____/s/_____
                                                       Ellen L.  Hollander
                                                       United States District Judge